**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**LABORATORY CORPORATION OF**
**AMERICA, INC.,**

    **Plaintiff,**

v.                                                                                                 **No. 19-cv-0495 SMV/KRS**

**SCOTT McMAHON, M.D. and**
**WHOLE WORLD HEALTH CARE, P.C.,**

    **Defendants.**

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an action to collect on two billing accounts. Plaintiff Laboratory Corporation of America, Inc. ("LabCorp") offers laboratory medical services in several states, including New Mexico. When a patient lacks insurance or is otherwise self-pay, the most typical way for a business such as LabCorp to bill is with a "pass-through" arrangement. The laboratory bills the physician who ordered the results. The physician pays the bill and then seeks reimbursement from the patient. Thus, the charges "pass through" the physician to the patient. Defendant Dr. McMahon held two accounts with LabCorp. LabCorp contends that these were pass-through accounts and that Dr. McMahon is liable for $117,210.00 of unpaid charges on the accounts. Dr. McMahon disagrees. He contends that the accounts were set up solely to facilitate billing for insured patients and that he never agreed to pay for any services rendered to uninsured patients.

Defendants filed a Motion for Summary Judgment on July 24, 2020. [Doc. 60]. LabCorp responded on August 7, 2020. [Doc. 61].[1] Defendants replied on August 21, 2020. [Doc. 63].[2] The Court held oral argument on October 21, 2020. [Doc. 69] (clerk's minutes). Viewing the facts in the light most favorable to LabCorp, there appears to be a genuine factual dispute as to whether Dr. McMahon agreed to be liable on the accounts for uninsured patients. Accordingly, Defendants' Motion for Summary Judgment will be DENIED.

## Background

Dr. McMahon is a physician practicing in Roswell, New Mexico. [Doc. 60] at 4, ¶ 1. Defendant Whole World Health Care, P.C. ("WWHC") is his private medical practice. *Id.* at 5, ¶ 2. Plaintiff LabCorp operates a healthcare diagnostics business offering various medical laboratory services to medical providers. *Id.* at ¶ 5. Dr. McMahon opened two accounts with LabCorp to provide laboratory services for his patients. The first, opened in his name only, was account number 30490765 (hereinafter referred to as "the McMahon account"). *Id.* at ¶ 6. The second, opened in the name of WWHC, was account number 30001260 (hereinafter referred to as "the WWHC account"). *Id.* at 6, ¶ 12.

In addition to his medical practice, Dr. McMahon serves as an expert witness in litigation involving persons with chronic inflammatory response syndrome. [Doc. 60] at 5, ¶ 4. In early 2018, Dr. McMahon agreed to serve as a consultant on potential class-action litigation for Brian Gormley, an attorney in the Washington D.C. area. *See id.* at 7. For this consultation work, Dr. McMahon created requisition forms that would allow Mr. Gormley to order lab work for his

---
[1] LabCorp filed a Notice of Errata on August 14, 2020, correcting a few details in the Response brief and Exhibit 1. [Doc. 62].
[2] Defendants filed a Notice of Errata on October 19, 2020, correcting a few citations in the Reply. [Doc. 67].

potential clients. *Id.* Dr. McMahon's assistant sent 200 of these requisition forms, which were blank other than Dr. McMahon's signature, to Mr. Gormley so that he could get blood tests for his potential clients. *Id.* Dr. McMahon assumed that the phlebotomist who ultimately did the blood draws would collect insurance information to cover the cost of the labs. *Id.* The requisition forms did not include either of his LabCorp account numbers when they left his office. *Id.*

Mr. Gormley hired an independent phlebotomist, Cris Digamo, to draw the blood for the tests. *Id.* at 8; [Doc. 60-1] at 23–24. In March 2018, Digamo approached LabCorp to obtain the necessary supplies for the tests. *See* [Doc. 61-6]. Digamo presented the McMahon account number and the forms with Dr. McMahon's signatures to the LabCorp employee.[3] *See id.* at 3–4. The LabCorp employee provided the supplies. *Id.* Although Dr. McMahon had instructed Mr. Gormley that the phlebotomist would need to collect insurance information from each patient when drawing blood, [Doc. 60-1] at 32, Digamo failed to do so and submitted specimens to LabCorp without any insurance information in March 2018, *see* [Doc. 63-2] at 3, McMahon Dep. 242:2–6. LabCorp processed the tests and began sending invoices to Dr. McMahon's office. *See* [Doc. 6] at 3, ¶ 17; [Doc. 70-1]. Dr. McMahon refused to pay the invoices.

## Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational

---

[3] LabCorp submitted an example of one of these forms. [Doc. 61-1] at 23. Both the McMahon and the WWHC account numbers appear at the top of the submitted example. *Id.* Ms. Smith, a LabCorp Vice President, testified that "LabCorp received these forms from a phlebotomist who presented Dr. McMahon's account information and specifically referenced" the McMahon account. *Id.* at 7, ¶ 26. Yet, it remains unclear how Digamo obtained the account numbers, *See* [Doc. 61-7] at 10, Villa Dep. 71:11–16, 72:6–22, and whether he submitted the forms to LabCorp with the account numbers at the top of the forms or if this information was added later.

trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (citation omitted). The issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In answering that question, the Court must view the evidence and draw all reasonable inferences from the underlying facts in the light most favorable to the party opposing the motion. *Becker*, 709 F.3d at 1022. Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 252.

I. **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR COLLECTION ON OPEN ACCOUNTS.**

There is no dispute that open accounts between laboratories and physicians often take the form of pass-through billings arrangements. *See* [Doc. 61] at 7, Plaintiff's Additional Material Fact ("AMF") No. 2; [Doc. 63] at 5, Defendant's Response to AMF No. 2. In light of this, the Court finds it prudent to focus the inquiry on whether the parties agreed to a pass-through billing arrangement.[4] Because there is a genuine issue of material fact regarding whether Dr. McMahon agreed to be held liable for any charges under either account, summary judgment is not appropriate.

---

[4] If the agreements were as Plaintiff argues, that is, if Dr. McMahon agreed to be liable for uninsured patients under a pass-through arrangement, the Court assumes, without deciding, that the accounts would qualify as open accounts. *See Gentry v. Gentry*, 1955-NMSC-055, ¶ 8, 59 N.M. 395, 285 P.2d 503. But if Dr. McMahon never agreed to be liable for any charges under the accounts, under any circumstance, then the open account/account stated issue is moot. If that's the case, there simply was no billing agreement. Defendants argue that "'[o]pen account' in § [39-2-2.1] . . . does not mean an amount owed on a single transaction." [Doc. 63] at 10 (quoting *S. Union Expl. Co. v. Wynn Expl. Co., Inc*., 1981-NMCA-006, ¶ 46, 95 N.M. 594, 624 P.2d 536) (*see also* Notice of Errata, [Doc. 67] at 1, stating that the case name was incorrectly cited as *Webb v. Arizona Public Serv. Co.*). Defendants argue that since LabCorp's invoices said, "TERMS: PAYABLE UPON RECEIPT," this means that the agreement (if one existed) contemplated

### A. A Brief Background of the McMahon Account

The McMahon account was established in 2011. [Doc. 61-1] at 3, ¶ 9. The only evidence of the creation of this account is LabCorp's internal account set-up form. *See id.* at 18. That form says nothing about the actual terms of the agreement. *See id.* Nor is there any evidence of record regarding discussions between the parties at the time they entered into the agreement. Generally, Dr. McMahon used this account to get lab results for patients he was treating, and LabCorp billed the patients' insurance companies. [Doc. 60-1] at 10; [Doc. 61-1] at 5, ¶ 17. No charges were ever billed directly to Dr. McMahon on the account until LabCorp sent him three invoices in March 2017. [Doc. 60-2] at 1; [Doc. 60-3] at 2. The invoices were for services rendered in 2015 and 2016. [Doc. 60-2]. LabCorp records indicate that it had tried to reach Dr. McMahon multiple times about these invoices, as early as September 2016, but was unable to contact him prior to March 2017. [Doc. 61-1] at 24–29. Dr. McMahon responded to these three invoices by stating that he did not think his account was set up for billing directly to him, and that he never agreed to any arrangement under which he would be liable for the cost of lab work. [Doc. 60-2] at 3. "I just order them (as a physician); I don't pay them." *Id.* Dr. McMahon never heard back from LabCorp about why the charges were billed to him. *See* [Doc. 61-3] at 3–4, McMahon Dep. 76:5–77:2. LabCorp

---

divisible liabilities and not "one, single indivisible liability fixed at the time of settlement." [Doc. 63] at 11 (quoting *S. Union*, 1981-NMCA-006, ¶ 52 (incorrectly cited as *Webb*, 95 N.M. 594, ¶ 21)). However, Defendants misapprehend the phrase "at the time of settlement." It does not refer to the time when each periodic invoice is paid. It refers to an indivisible liability which arises for the remaining balance when the account is closed. *See Gentry*, 1955-NMSC-055, ¶ 8. The "time of settlement" referred to in *Southern Union* is the closing of the account, i.e., when "it shall suit the convenience of either party to settle and close the account." *See* 1981-NMCA-006, ¶ 47 (quoting *Gentry*, 1955-NMSC-055, ¶ 8). It is at that point that the remaining balance (comprising one or a series of debits) becomes "but one single and indivisible liability" on the part of the debtor. *See Gentry*, 1955-NMSC-055, ¶ 8. That is how a pass-through account works. The lab bills the doctor for the charges as services are rendered. The doctor pays the outstanding balance each month, which will vary based on the number of patients tested. If either party decides to terminate the account, the remaining balance is totaled up and becomes "one single and indivisible liability," for which the doctor is liable. *See id.* The Court stresses that it has not determined such an agreement existed in this case.

wrote off the charges and made no further effort to collect on them. *Id.* LabCorp's Assistant Vice President for Revenue Cycle Management, Michele Mittelman Smith, testified that the write-offs were a "one-time courtesy" to Dr. McMahon. [Doc. 61-1] at 6, ¶ 19. But there is no evidence that this reasoning was ever communicated to Dr. McMahon. *See* [Doc. 61-3] at 3–4, McMahon Dep. 76:5–77:2.

LabCorp contends that its standard practice when setting up accounts includes explaining to account holders that they will be held liable for any charges not paid by insurance. [Doc. 61-1] at 3–4. LabCorp offers a standard checklist to show that its practice is to make sure its clients understand the terms of their accounts. *See id.* at 4, 19–20. LabCorp further contends that its policies require periodic "in-services" for account holders to review billing terms. *Id.* at 4–5. LabCorp asserts that it performed such an in-service with Dr. McMahon as recently as November 2, 2015, not long before the first set of disputed charges were incurred. *Id.* at 4–5, 21.[5] From this evidence, LabCorp argues that Dr. McMahon was aware that if labs were submitted via his account without insurance-billing information, he would be responsible for the charges. *See* [Doc. 61-1] at 4.

### B. When Viewed in the Light Most Favorable to LabCorp, There Is Sufficient Evidence To Create a Genuine Issue of Material Fact As To Whether Dr. McMahon Agreed To Be Held Liable Under the McMahon Account.

Although LabCorp produced no evidence of a written or oral contract under which Dr. McMahon agreed to be held personally liable for charges under the account, the evidence it did present creates a genuine dispute of material fact. LabCorp's Assistant Vice President,

---

[5] Ms. Rose testified that she was not the person who set up the McMahon account but that she met with Ms. Villa on several occasions for standard check-ins on the McMahon account to answer questions. [Doc. 61-2] at 2–5. However, the testimony of Ms. Villa contradicts LabCorp's claims that it performed in-services with her at Dr. McMahon's office; she claimed that she never participated in any in-service. [Doc. 61-7] at 4.

Ms. Smith, testified regarding LabCorp's standard policies and procedures. [Doc. 61-1]. She explained that it is LabCorp's practice to review the terms of the pass-through agreement both when an account is initially created and during every periodic in-service. *Id.* at 3–4, ¶¶ 10–14. To support Ms. Smith's testimony, LabCorp submitted its standard account creation checklist and a record of the in-service Dr. McMahon received in November 2015. *Id.* at 19–21. On the in-service checklist from November 2015, the following items are checked off under "Review Billing Information":

- ✓ Discrepancy Policy
- ✓ Payment Information Policy
- ✓ Insurance Information Policy
- ✓ Explain client billing, primary vs. secondary insurance filing policy
- ✓ Discuss Research Use Only/Investigational Use Only Procedure
- ✓ *Provide examples of and review Patient Bill Process and Client Bill*
- ✓ Outline capitated patient information requirements required for billing if applicable
- ✓ Explain processes for obtaining billing information: mailers, [illegible], etc.

*Id.* at 21 (emphasis added). Ms. Smith asserts that because LabCorp reviewed patient and client billing examples with Dr. McMahon at the 2015 in-service, he must have known and understood the terms of the pass-through agreement with LabCorp. *Id.* at 4-5, ¶ 15. She further states that, after the 2015 in-service, LabCorp "did not receive any instruction . . . to close or deactivate" the account, which is evidence that Dr. McMahon did not object to the billing terms. *Id.* at 5, ¶ 16. Thus, when interpreting this evidence in the light most favorable to LabCorp, the Court finds that it amounts to more than a scintilla of evidence that Dr. McMahon accepted the terms of the pass-through agreement.

In addition to what is outlined above, LabCorp contends that there is other evidence that shows that Dr. McMahon knew that he could be personally liable on the McMahon account.

Ms. Smith also testified that it is standard industry practice for physicians, particularly those in a small practice, to be liable for services for uninsured patients because diagnostic laboratory companies need an incentive for physicians to collect insurance information. [Doc. 61-1] at 3–4, ¶ 11. Thus, the argument goes, Dr. McMahon should have known that he could be liable, based on common industry standards. Moreover, at his deposition, Dr. McMahon testified that he knew he could be liable to pay (on the McMahon account) if a phlebotomist that *he employed* failed to do his or her job to collect and submit insurance information. [Doc. 61-3] at 5; McMahon Dep. 99:14–110:20. Viewing this evidence in its totality, and in the light most favorable to LabCorp, the Court finds that it is sufficient to establish at least a reasonable inference that Dr. McMahon understood and accepted that he would be held liable for self-pay patients under the McMahon account.[6] Because all reasonable inferences must be resolved in favor of the nonmovant, Defendants are not entitled to summary judgment on Count I.

### C. A Brief Background of the WWHC Account

Dr. McMahon testified that LabCorp contacted his office in early 2018 about setting up a new account:

> Q. When, to your understanding, did LabCorp ultimately decide to write-off the charges?
> A. By either January or February of 2018 is when I first heard about it.
> Q. How did you first hear about it?
> A. I believe that Katie Rose[7] had communicated with Christine Villa[8] and was suggesting that we might need to change the account that we had.
> Q. So it's your understanding that Ms. Rose reached out to Ms. Villa?

---

[6] Which is not to say that there is no evidence to the contrary, or that any inference drawn from the cited evidence must fall in LabCorp's favor. But at this juncture, the Court's job is not to weigh the evidence, but only to determine whether there is a genuine issue of material fact. Because equally plausible inferences could be drawn from the evidence of record, the Court must deny the Motion as it pertains to the McMahon account.

[7] Ms. Rose worked for LabCorp as a Key Account Executive in 2018. [Doc. 61-2].

[8] Ms. Villa worked in the WWHC medical office as a phlebotomist and collected insurance information for patients who had lab work done. [Doc. 61-7].

> A. Yeah. I'm not exactly sure who reached out to who, but somehow or another they conversed and the idea came that I needed to change the account.
> Q. What do you mean by "change the account"?
> A. I think I'm using Katie Rose's terminology. I don't know, I mean, basically my understanding was if we had a previous account, we're going to get rid of that and create a new one and start fresh.

[Doc. 61-3] at 7; McMahon Dep. 115:15–116:7.

Ms. Rose testified that she explained the terms of the new account in an email dated January 31, 2018. [Doc. 61-2] at 6, Rose Dep. 26:3–5. Because the email thread between Ms. Rose and Dr. McMahon is the only evidence of the intent of the parties at the time of the creation of the WWHC account, relevant language from the thread is outlined below:

- Dr. McMahon wrote to Ms. Rose on January 17, 2018, to inquire about "the possibility of our building becoming a draw station for LabCorp . . . and sending all our lab[s] to LabCorp." [Doc. 61-1] at 31.

- Ms. Rose responded and explained that she could set up an account for him. She added, "I'd be happy to set up special pricing for your account. That way the patients who are self[-]pay can be billed to the clinic and the clinic can pass on their savings to the patient." *Id.* at 32.

- Dr. McMahon then asked Ms. Rose, "What does setting up an account mean?" *Id.* at 34.

- Ms. Rose responded, "It means that you would commit to sending your specimen to LabCorp. Keep in mind we are in[-]network with all major insurance companies and are exclusive with United Healthcare, which will help maximize your patients['] in[-]network benefits. I've attached a list of insurances we do accept. Please let me know if you'd like to move forward with LabCorp and if you have any additional questions." *Id.*

- Dr. McMahon followed up her explanation with another clarifying question, "So the patient is obligated for the payment, not me? I do not need to collect money from them, just gather their appropriate demographic and insurance information? If that's the plan, let's move forward." *Id.* at 34–35.
- On January, 31, 2018, Ms. Rose answered, "If the patient has insurance[,] LabCorp will bill the insurance. If the patient is self-pay[,] they would need to go to a LabCorp draw site and pay for the labs upfront[,] or your clinic could take on the cost of the labs. The cost of the labs to the clinic is much less than the patient going to the patient service center. If your clinic did choose to take on the cost of the labs[,] they would then receive an invoice at the end of each month." *Id.* at 35.
- Dr. McMahon responded, "Would prefer to avoid collecting money[,] etc. Let's set up the account for insured patients. The phlebotomist always checks for insurance information before drawing." *Id.*
- When Dr. McMahon filled out the information to set up the account, in the "Billing Contact" section, he wrote, "What bill?" *Id.* at 37.
- Ms. Rose responded by explaining why LabCorp would need a "Billing Contact." She said, "I understand that you don't want to be billed for patients that are self[-]pay. However, I still have to put a billing contact. We use this information in case we need to reach out regarding additional dx codes or need more patient demographics." *Id.*

The WWHC account was created in February 2018, and the lab charges at issue in this case began being added to the account in March 2018. [Doc. 61-1] at 31–39; [Doc. 61-6] at 2, Anderson

Dep. 12:17–20. In September 2018, Dr. McMahon used the WWHC account to order a lab for a single self-pay patient. [Doc. 63-2] at 2, McMahon Dep. 162:6–8.

### D. When Viewed in the Light Most Favorable to LabCorp, There Is Sufficient Evidence To Support an Inference That Dr. McMahon Agreed To Be Liable Under the WWHC Account.

This Court is convinced that a reasonable factfinder could find that Dr. McMahon agreed to be liable under the WWHC account. After the confusion over the McMahon account, Dr. McMahon might have thought that he and LabCorp agreed that he would not be liable for self-pay patients. But then LabCorp let it be known that the old agreement was unsatisfactory, and LabCorp wanted something different. "[LabCorp] reached out to [my office with] the idea . . . that I needed to change the account." [Doc. 61-3] at 7, McMahon Dep. 115:23–16:2. During his subsequent discussions about setting up the new account, Ms. Rose told him, "If the patient is self-pay they would need to go to a LabCorp draw site and pay for the labs upfront or your clinic could take on the cost of the labs." [Doc. 61-1] at 35. Dr. McMahon responded, "Would prefer to avoid collecting money etc. Let's set up the account for insured patients." *Id*. The parties, not surprisingly, characterize this exchange differently. Dr. McMahon contends that when he said he would prefer to avoid collecting money, he was making it clear that he would not accept personal liability for any charges. [Doc. 60] at 6, Undisputed Material Facts Nos. 13–16. LabCorp argues that what he meant was that he intended to use the account for insured patients, but that if he did use it for an uninsured patient, he would accept liability for the charges. [Doc. 61] at 10, AMF No. 16. Neither interpretation is outlandish.

Moreover, the parties' conduct after the account was established gives some credence to LabCorp's argument. Despite his stated intent to use the account solely for insured patients,

Dr. McMahon did use the account for at least one self-pay patient. [Doc. 61] at 5, ¶ 7. Additionally, when LabCorp mailed the charges for the testing of Gormley's clients, Dr. McMahon did not contact LabCorp to refute the charges; he did not respond to them until LabCorp initiated collection proceedings. [Doc. 61] at 14, ¶ 39. This evidence is sufficient to establish at least an inference that Dr. McMahon understood and accepted that he would be held liable for self-pay patients under the WWHC account.[9] Because all reasonable inferences must be resolved in favor of the nonmovant, Defendants are not entitled to summary judgment on Count II.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR EQUITABLE RELIEF.

The parties do not dispute the elements needed to prevail on an equitable claim based on quantum meruit or unjust enrichment in New Mexico. *See* [Doc. 60] at 13–14; [Doc. 61] at 21–22. Both cite to an opinion by the Court of Appeals of New Mexico that summarizes state law in a claim for restitution.

> New Mexico has recognized a theory of quantum meruit distinct from contract. *See Terry v. Pipkin*, 1959-NMSC-049, ¶ 8, 66 N.M. 4, 340 P.2d 840. More recently, our Supreme Court characterized the action as a claim for unjust enrichment. *Hydro Conduit Corp. v. Kemble*, 1990-NMSC-061, ¶ 11, 110 N.M. 173, 793 P.2d 855. In describing that action, the Supreme Court has identified the theory and rationale: "One who has been unjustly enriched at the expense of another may be required by law to make restitution. *Restatement of Restitution* § 1 comments a, b, c (1937). This quasi-contractual obligation is created by the courts for reasons of justice and equity, notwithstanding the lack of any contractual relationship between the parties." *Id.* at ¶ 8 (quoting *United States ex rel. Sunworks Div. of Sun Collector*

---

[9] Which is not to say that there is no evidence to the contrary, or that any inference drawn from the cited evidence must fall in LabCorp's favor. For example, it would be reasonable to infer, as LabCorp suggests, that its desire for a new account means that it was dissatisfied with the terms of the old one. But it would be equally plausible to argue that if one is burned because of a disagreement over the terms of an oral contract, one would get the second contract in writing. But at this juncture, the Court's job is not to weigh the evidence, but only to determine whether there is a genuine issue of material fact. Because equally plausible inferences could be drawn from the evidence of record, the Court must deny the Motion as it pertains to the WWHC account.

>    *Corp. v. Ins. Co. of N. Am.*, 695 F.2d 455, 458 (10th Cir.1982) (citations and footnote omitted)).

*Tom Growney Equip., Inc. v. Ansley*, 1994-NMCA-159, ¶ 6, 119 N.M. 110, 888 P.2d 992. Under New Mexico law, to prevail on an equitable claim based on quantum meruit or unjust enrichment, a plaintiff must establish that (1) a defendant has knowingly benefitted at the plaintiff's expense (2) in such a manner that allowing the benefit to be retained would be unjust.[10] *Id.*; *see also Armijo v. FedEx Ground Package System, Inc.*, 285 F. Supp. 3d 1209, 1218 (D.N.M. 2018) (quoting *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695).

In this case, LabCorp claims that if it cannot prevail on its theory of open account, then it should prevail on a theory of restitution because Dr. McMahon was unjustly enriched. [Doc. 61] at 21–22. In defense, Dr. McMahon claims that he received no benefit from the services LabCorp rendered in March 2018. [Doc. 60] at 13–15. However, a reasonable factfinder could be persuaded to conclude otherwise. *See Anderson*, 477 U.S. at 248.

A reasonable factfinder could conclude that Dr. McMahon knowingly benefited from LabCorp's services. *See Tom Growney Equip., Inc.*, 1994-NMCA-159, ¶ 6. It is worth noting that the services provided were not for patients of Dr. McMahon but for clients of Mr. Gormley. [Doc. 60] at 8, ¶34, 9, ¶ 36. Therefore, arguably, if anyone benefited from the services, it was Mr. Gormley and his clients. However, it is also important to note that Dr. McMahon completed his work for Mr. Gormley after reviewing test results delivered to him from LabCorp, *see* [Doc. 61-8] at 7, Lilley Dep. 111:24–112:2, and this Court must view the facts in the light most favorable to LabCorp, *Williams*, 983 F.2d at 179. Thus, a reasonable factfinder could conclude

---

[10] The elements outlined by the Supreme Court of New Mexico follow the Restatement. *See* Restatement (Third) of Restitution and Unjust Enrichment §§ 1–2 (Am. L. Inst. 2011) ("[T]he receipt of a benefit at the expense of the claimant is a necessary but not a sufficient condition of liability in restitution." Restatement § 2 cmt. a.).

that Dr. McMahon's ability to complete his work for Mr. Gormley was in fact a benefit that Dr. McMahon knowingly received.

Moreover, a reasonable factfinder could conclude that it would be unjust to allow Dr. McMahon to retain the benefit he received without compensating LabCorp. *See Tom Growney Equip., Inc.*, 1994-NMCA-159, ¶ 6. Defendants argue that any benefit received was not unjust because of the small amount of money Dr. McMahon earned for his services. [Doc. 60] at 9. In support of this contention, Defendants assert that Dr. McMahon charged Mr. Gormley $400 per hour for his services on the class action suit, which totaled $10,000[11] thus far. *Id.* He spent two or three hours of that work reviewing LabCorp test results; therefore, at most, he earned $1,200 for his work that required the services of LabCorp. *Id.* at 15. Yet, LabCorp demands payment for more than $100,000 worth of lab tests because insurance information was not submitted before the timely filing deadlines expired.[12] *See, e.g.*, *id.* at 8, ¶¶ 33, 35.

However, this Court must view the facts in the light most favorable to LabCorp. *Williams*, 983 F.2d at 179. Dr. McMahon provided 200 requisition forms to Mr. Gormley so that he could order lab tests for his potential clients. [Doc. 61-8] at 4, Lilley Dep. 62:1–8. The forms were blank except for Dr. McMahon's signature when he sent them to Mr. Gormley. *Id.* The forms had no blank lines or any indication that insurance information should be added. [Doc. 61-7] at 10, 11, Villa Dep. 71:11–13, 74:8–14. An independent phlebotomist filled in patient information, conducted blood draws, and submitted the specimens with the forms—containing Dr. McMahon's

---

[11] At oral argument, counsel for Defendants suggested this figure is no longer the accurate amount.
[12] *See* Restatement § 1 cmt. d ("[T]he law of restitution identifies those circumstances in which a person is liable for benefits received, measuring liability by the extent of the benefit. Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth . . . . but principles of unjust enrichment will not support the imposition of a liability that leaves an innocent recipient worse off, apart from costs of litigation, than if the transaction with the claimant had never taken place.").

signature and the McMahon account number, but no insurance information—to LabCorp in March 2018. *See* [Doc. 61-1] at 7, ¶¶ 25–26; [Doc. 63-2] at 3, McMahon Dep. 242:2–6. LabCorp claims that, with these actions, the independent phlebotomist represented himself as an agent of Dr. McMahon, with apparent authority to act on his behalf. [Doc. 61] at 22–25. LabCorp urges this Court to consider its apparent agency argument in the context of restitution because equity cannot allow Dr. McMahon to "escape liability" where "he created the 'enabling circumstances' giving rise to a reasonable assumption of agency." [Doc. 61] at 22. A reasonable factfinder could agree and conclude that fundamental fairness requires sharing the costs of the mistake to avoid unjust enrichment.

Because the Court will deny summary judgment as to Counts III and IV, it need not consider the apparent agency argument in greater detail.[13] Since a reasonable factfinder could conclude that the balance of the equities requires a remedy in restitution to avoid unjust enrichment, judgment as a matter of law is not appropriate, *see* Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 248, and the Motion for Summary Judgment on Counts III and IV will be denied.

### Conclusion

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion for Summary Judgment [Doc. 60] is **DENIED**.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**

---

[13] Moreover, it is worth noting that this whole predicament could have been avoided if the parties had communicated in March 2018. LabCorp could have called Dr. McMahon immediately upon realizing that there was no insurance information submitted with the tests, as Ms. Villa's testimony stated was its usual practice. [Doc. 61-7] at 11. However, LabCorp did send Dr. McMahon an invoice at the end of March 2018, *see* [Doc. 70], which presumably Dr. McMahon should have received and acted on. Had either party taken further steps in March or April of 2018, the timely filing deadlines for billing insurance companies could have been met. *See* [Doc. 61-3] at 28–29.